IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| LASONYA SPIDELL, | : | |
| Plaintiff, | : | |
| | | Case No. 3:12cv00039 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATIONS[1]**

## I.   INTRODUCTION

Plaintiff Lasonya Spidell brings this case challenging the Social Security Administration's denial of her applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). Plaintiff protectively filed[2] her SSI and DIB applications on May 13, 2009, asserting that she has been under a "disability" since October 1, 2007. (*PageID##* 239-240, 241-243). Plaintiff claims to be disabled by "diabetes, double by pass 3/15/09, [and] back pain." (*PageID#* 256).

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

[2] A protective filing date is the date a claimant first contacted the Social Security Administration about filing for disability benefits. It may be used to establish an earlier application date than when the Social Security Administration received the claimant's signed application. *See* http://www.ssa.gov/glossary.

1

After various administrative proceedings, Administrative Law Judge (ALJ) Eve B. Godfrey denied Plaintiff's applications based on her conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act. (*PageID##* 72-83). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration. This Court has jurisdiction to review the administrative denial of her applications. *See* 42 U.S.C. §§405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12), the administrative record (Doc. #7), and the record as a whole.

## II.     BACKGROUND

### A.     Plaintiff's Vocational Profile and Testimony

Plaintiff was 44 years old on her alleged disability onset date, which defined her as a "younger individual" for purposes of resolving her DIB and SSI claims. *See* 20 C.F.R. §§ 404.1563(c); 416.963(c)[3]; *see also PageID##* 239, 241. Plaintiff's previous relevant work included working as an invoice control clerk, a deli clerk, and a salesperson. (*PageID#* 119). She worked at Standard Register in Dayton for 20 years. (*Id.*).

As a deli clerk, Plaintiff testified she had to lift heavy meat out of the freezer. (*PageID#* 95). As a salesperson, Plaintiff testified she had to lift 50 pounds or more of

---

[3] The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI/DIB Regulations.

inventory off the delivery trucks upon arrival, and had to hang clothes in the department store. (*Id.*). Plaintiff testified she "was used all over the store and [she] enjoyed [her job] thoroughly." (*PageID#* 96).

When she is at home and tries to do the laundry, mop floors, wash walls, move furniture, or clean, she testified she ends up having to lay down for one to three days afterwards because of the pain in her arms, legs, and chest. (*Id.*). She stated she lives in low income housing, and is asked to keep the apartment clean. (*PageID#* 116). She testified that it can be difficult to keep the place clean, particularly when housing authorities come around to inspect, however, she "gets through it." (*Id.*). She also testified she has difficulty with her breathing that often causes her to seek medical treatment. (*Id.*). Plaintiff further stated that she has severe diarrhea in the morning or before she goes to bed, and this prevents her from leaving the house until it clears up. (*PageID#* 96). Plaintiff testified she has diarrhea when she is anxious, and sometimes has accidents. (*PageID#* 102). She stated she needs to bring extra clothes with her when she leaves the house and sometimes has an accident two times in a day. (*PageID#* 103).

Plaintiff further testified her anxiety also causes her night sweats, insomnia, and hot flashes. (*PageID#* 114). Plaintiff stated during these periods of anxiety she "can be confrontational when somebody doesn't understand[ ] what [she is] trying to say and ang[ry] because of a lot of things." (*Id.*). She stated she also cries quite a bit, particularly when she has feelings as though she does not have control of her life anymore or that she is not part of "normal civilization." (*Id.*). She stated she "can't handle it anymore . . .

staying balanced." (*PageID#* 115). Sometimes these feelings cause her to have panic attacks, during which time Plaintiff testified she closes the shades, turns off the television, unplugs the phone and tries to calm herself down. (*Id.*) These episodes vary in length, but Plaintiff stated she once had an episode that lasted for a month. (*Id.*). Plaintiff also testified in great detail regarding the problems she has with her menstrual cycle, including significantly dysfunctional bleeding and severe abdominal pain. (*PageID#* 103-04). Plaintiff stated these symptoms last for approximately 10 days at a time, and occur on three occasions per year. During such time, Plaintiff testified she lays in bed and does not go out of the house. (*Id.*). At the time of the hearing, Plaintiff weighed 205 pounds, and was 5' 1".

Plaintiff stated her adult son is on the lease for her home, but he does not often stay with her at the house because he works in a different city and mostly stays with his girlfriend to save money on the gas needed to drive to work. (*PageID#* 98). Plaintiff testified her son does stay with her on occasion, particularly when she needs him to help her with something. (*Id.*). Plaintiff stated she has a driver's license but does not typically drive (unless she borrows a friend's car) because she cannot afford to own a vehicle. (*Id.*). She typically relies on public transportation or rides from friends to get around. (*PageID#* 100).

Plaintiff testified she sometimes takes a walk around the block to get her sugar down, because she stated she does not have all her medications for her diabetes all the time due to financial reasons. (*Id.*). When she takes these walks, she testified she starts

4

off walking slow, and it takes her approximately one hour each way. (*PageID#* 107). Plaintiff testified she can go grocery shopping, has some neighbors in her apartment complex she socializes with, and volunteers with her church and ministry to sing for elderly people in a nursing home "on a couple of occasions here and there." (*PageID#* 101). Plaintiff testified sometimes her minister takes her out to eat after she finishes her volunteer work. (*Id.*).

### B. Medical Records and Opinions

#### 1. Physical Impairments

Plaintiff was hospitalized at Good Samaritan Hospital from February 27, 2009, through March 3, 2009, following complaints of chest pain. (*PageID##* 313-317). Plaintiff's glucose was 331, and treatment notes indicate she had been non-compliant with her medications. (*PageID#* 314). Plaintiff was placed on sliding scale insulin which helped keep her glucose controlled during her time at the hospital. Plaintiff also underwent a stress test, results appeared predominately normal, and she was discharged in stable condition. (*PageID##* 314-315).

Plaintiff returned to the hospital on March 15, 2009, again complaining of chest pain. (*PageID#* 318-321). Testing revealed severe multivessel coronary artery disease/atherosclerotic heart disease, and left main disease with myocardial infarction (heart attack). As a result, she underwent a myocardial revascularization utilizing two coronary artery bypass grafts. (*PageID##* 326-27). Her diabetes was again noted as being uncontrolled. (*Id*). She was discharged on March 24, 2009, in stable condition.

5

On April 1, 2009, Plaintiff returned to Good Samaritan Hospital complaining of chest pain and shortness of breath. (*PageID#* 347).  The physicians attributed her pain to her recent surgery, prescribed Plaintiff with percocet, and discharged her from the hospital.  (*PageID##* 351).  On April 16, 2009, Plaintiff again returned to the hospital, complaining of abscesses under her arms which were lanced.  (*PageID##* 356-359). Aside from the pain there, she reported no chest pain or shortness of breath, and believes her blood sugars have been good.  (*PageID#* 357).  On April 27, 2009, Michael J. Swanson, D.O., discharged Plaintiff from post-operative care**.**  (*PageID##* 364-367).  He noted her incisions healed well, with no signs of infection; there was no erythema, edema or drainage at any of the operative wounds; her sternum was stable; lungs were clear; heart tones were audible and clear; and she had no carotid bruit.  (*Id.*).  Dr. Swanson also noted that Plaintiff continued to complain of shortness of breath, but had no chest pain. (*Id.*).  After a follow up visit, her cardiologist, Reginald Sequeria, M.D., noted that Plaintiff continued to notice some shortness of breath with activity and pain at the incision site every time she takes a deep breath, as well as wheezing at night. (*PageID#* 388).  He noted, however, her cardiac examination revealed a regular rate and rhythm, and her lungs were clear.  (*Id.*).  Dr. Sequiera opined he was "not quite sure why she is still short of breath.  There is no evidence for congestive heart failure and ejection fraction is normal."  (*Id.*).  On June 22, 2009, Dr. Sequiera released Plaintiff to return to work from a cardiac standpoint.  (*Id.*).

On July 7, 2009, Plaintiff again returned to the hospital with complaints of chest pain. (*PageID#* 418-427).  Cardiac testing, however, revealed normal results, and Plaintiff was discharged that same day. (*Id.*).  Following her heart attack, Plaintiff also obtained regular treatment through the Drew Health Center. (*PageID#* 466-478).  These notes indicate shortness of breath, chest pain, and diabetes management as ongoing issues with Plaintiff. (*PageID##* 476-478, 542-554, 577-580).

On March 3, 2010, Plaintiff again returned to Good Samaritan Hospital, complaining of lower abdominal pain and heavy vaginal bleeding lasting the past week. (*PageID##* 514-524).  Notes from her visit also indicate she complained that her menstruation has been very irregular for years. (*Id.*)  Treatment notes indicate heavy vaginal bleeding, and a diagnosis of dysfunctional uterine bleeding. (*PageID#* 519).  Plaintiff was advised to follow-up with primary care physician and to get an ultrasound of the pelvis. (*Id.*).

On July 23, 2010, Plaintiff again returned to Good Samaritan hospital, complaining of abdominal cramping and burning, nausea, vomiting, blurred vision, numbness and tingling in her hands and feet, increased thirst and blood sugar problems.  Plaintiff stated she was out of insulin for 2 to 3 weeks.  These symptoms were attributed to medication noncompliance and adverse effects of medications. (*PageID##* 528).

On December 12, 2010, Plaintiff again returned to Good Samaritan Hospital, via ambulance, complaining of cramping and one episode of diarrhea. (*PageID#* 557).  It was noted that she stated the pain started in the lower part of her abdomen, then pulled

through to the upper part, but the pain was gone at the time of the examination. She had some nausea but no vomiting, denied chest pain or shortness of breath. (*Id.*). Labwork was returned unremarkable; pain was attributed to bowel spasm from cramping and diarrhea; no sign of bleeding; she was observed at the hospital and then released after no return of pain, nausea, vomiting, or diarrhea. (*PageID#* 558).

On October 31, 2009, Dr. Walter Holbrook reviewed the physical evidence of record for the agency and opined that Plaintiff can lift twenty pounds occasionally; ten pounds frequently; can never climb ladders, ropes or scaffolds or work at unprotected heights; can stand and/or walk for a total of about 6 hours in an 8-hour workday; and sit for a total of about 6 hours in an 8-hour workday. (*PageID* # 453-60). On March 29, 2010, another reviewer, Dr. Leigh Thomas, M.D., affirmed Dr. Holbrook's opinion, noting there was "no significant worsening established." (*PageID#* 489).

### 2. Mental Impairments

State agency consulting psychologist Mary Ann Jones, Ph.D., completed a comprehensive clinical interview and examination on August 13, 2009. (*PageID##* 429-434). Dr. Jones noted Plaintiff's functioning was markedly limited in a number of areas, diagnosed her with Bipolar Disorder, Posttraumatic Stress Disorder, and Psychological Factors Affecting Physical Condition. (*PageID##* 433-34). She assigned a Global Assessment of Functioning Score of 50.

Agency consultant Tasneem Kahn, Ed.D., reviewed Dr. Jones' report on September 14, 2009. (*PageID#* 435-52). He accepted Dr. Jones' diagnoses; identified

moderate difficulties in maintaining concentration, persistence, or pace and in maintaining social functioning; and noted that Plaintiff is moderately limited in eight areas. (*PageID##* 449-50). He noted that Plaintiff is able to perform simple one to three step tasks in a routine and predictable environment where changes can be easily explained and can manage intermittent contact with supervisors or coworkers. (*PageID#* 452). His assessment was later affirmed by another agency reviewer, Leslie Rudy, Ph.D., on March 8, 2010. (*PageID#* 488).

  C. **Medical Expert Testimony**

At the hearing, a medical expert, G. Charles Oliver, M.D., testified after reviewing Plaintiff's medical records and testimony. Dr. Oliver, a cardiologist, testified that Plaintiff had a single lesion in a major coronary artery in March 2009, but after her bypass of two of the arteries that an echocardiogram performed July 7, 2009, shows she has normal functioning of her heart muscle. (*PageID#* 108). Dr. Oliver further noted that Dr. Sequiera indicated Plaintiff had normal injection fraction - a measurement of how well the heart was pumping. (*Id.*). Dr. Oliver testified that "everything [he] see[s] and hear[s] in the medical record since her bypass surgery indicates that her cardiac function is totally normal." (*Id.*). As to the complaints of tightness and pain at the surgical site, shortness of breath, fatigue, headaches, and pain in her chest radiating into her leg that Plaintiff claims to still have, Dr. Oliver did not believe there was any anatomic basis for any of these "as far as the heart's concerned." (*PageID#* 109). Dr. Oliver further opined that "as far as pain she had her heart surgery back in 2009, that's almost two years ago so

9

there's no reason that scar should still be causing her pain." (*Id.*). Dr. Oliver also testified that he did not believe diabetes or high blood sugar to be disabling. He opined, "[i]f somebody gives themselves insulin shots then their blood sugar becomes very low and they pass out then their diabetes isn't very well regulated. And I don't think this is the problem here." (*PageID#* 110). Dr. Oliver, however, did note in the beginning of his testimony that he is a cardiologist so he felt he is "not really equipped to deal with the psychological and psychiatric and the – some of the heavy bleeding and the diarrhea issues." (*PageID#* 108).

      D.    **Vocational Expert Testimony**

A vocational expert (VE), Gloria Lasoff, also testified at the administrative hearing. She classified Plaintiff's work as an invoice control clerk, deli clerk, and sales person. (*PageID#* 119).

The VE testified that a hypothetical individual who is limited to simple, repetitive tasks in a non-public work environment and minimal contact with co-workers and supervisors could perform jobs at the light exertional level, such as a sorter (500 jobs in the Dayton area), a laundry marker (600 in the Dayton area), and an assembler (800 in the Dayton area). Such a hypothetical individual could also perform sedentary work as a sealer (1,100 jobs in Ohio), and production inspector (2,000 jobs in Ohio). (*PageID#* 131). The VE noted that a person could only be absent one or sometimes two times per month, and if absent more, then he or she could not maintain an employer's expected level of pace or productivity, and could not maintain competitive work. (*PageID#* 127).

The VE also testified a week of absences every three months would not be acceptable for an employer. (*Id.*).

### III. ADMINISTRATIVE REVIEW

#### A. "Disability" Defined

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §§ 423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health & Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

#### B. ALJ Godfrey's Decision

ALJ Godfrey resolved Plaintiff's disability claim by using the five-Step sequential evaluation procedure required by Social Security Regulations. *See PageID##* 72-83; *see also* 20 C.F.R. § 404.1520(a)(4). Her pertinent findings began at Step 2 of the sequential evaluation where she concluded that Plaintiff had the following severe

impairments: status-post coronary artery bypass graft in 2009 and a depressive disorder. (*PageID#* 75).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner's Listing of Impairments.  (*PageID#* 75).

At Step 4, the ALJ concluded that Plaintiff retained the residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except she would be limited to no climbing of ladders, ropes or scaffolds; no unprotected heights and no workplace hazards, such as dangerous machinery; and she would be limited to simple, repetitive tasks in a non-public work environment and minimal contact with co-workers and supervisors.  (*PageID#* 76).

The ALJ concluded at Step 4 that Plaintiff is not capable of performing her past relevant work as an invoice control clerk (performed at a light level of work activity), deli clerk (performed at the medium level of work activity), and salesperson (performed at the medium level of work activity). (*PageID#* 81).

At Step 5, the ALJ concluded that Plaintiff could perform a significant number of jobs in the national economy.  (*PageID##* 82-83).

The ALJ's findings throughout her sequential evaluation led her to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB or SSI.  (*PageID#* 83).

**IV.    JUDICIAL REVIEW**

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec*., 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part

13

*Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V. DISCUSSION

### A. The Plaintiff's Contentions

Plaintiff argues the ALJ fails to assign weight to the opinions of a state agency examiner; fails to identify and consider all of Plaintiff's severe impairments; errs in relying upon the testimony of the vocational expert; neglects to address a mental health diagnosis which could give rise to Plaintiff's physical symptoms; that the ALJ's decision is not supported by substantial evidence and the Commissioner's position is not substantially justified. (Doc. #8, *PageID#* 590).

### B. Analysis

Plaintiff argues, in part, that the ALJ erred because she failed to identify and properly consider all of her impairments. Specifically, Plaintiff contends the ALJ erred by entirely failing to address her dysfunctional uterine bleeding as an impairment, and by failing to recognize Plaintiff's diabetes as a "severe" impairment. (*Id.* at *PageID#* 593-94). Defendant contends substantial evidence supports the ALJ's evaluation of Plaintiff's diabetes, and that "[u]nder the circumstances, the ALJ did not commit reversible error by not discussing Plaintiff's symptoms of uterine bleeding." (Doc. # 11, *PageID#* 614-18).

At Step 2, the ALJ found Plaintiff to have two severe impairments: status-post coronary artery bypass graft in 2009 and a depressive disorder. (Doc. #7, *PageID#* 75). The ALJ determined these impairments have lasted more than 12 months and cause more

14

than a slight limitation of the claimant's physical or mental ability to do basic work activities. (*Id.*). The ALJ also considered Plaintiff's diabetes mellitus, but determined such impairment to be "not severe" based on her conclusion the medical and other evidence established only a slight abnormality or combination of slight abnormalities that would have no more than a minimal effect on Plaintiff's ability to work. (*Id.*). In reaching this conclusion, the ALJ relied primarily upon Plaintiff's noncompliance with medications and medical expert testimony from Dr. Oliver, a cardiologist, that diabetes mellitus was not a disability. (*Id.*).

Subsequently, at Step 4, the ALJ determined that Plaintiff has the residual functional capacity to perform light work, except she would be limited to no climbing of ladders, ropes or scaffolds; no unprotected heights and no workplace hazards, such as dangerous machinery; and only repetitive tasks in a non-public work environment and minimal contact with co-workers and supervisors. (*PageID#* 76). Plaintiff contends, however, that the ALJ failed to address the medical evidence and her testimony regarding her dysfunctional uterine bleeding. (Doc. #8, *PageID#* 593). Plaintiff argues "[t]here is no indication in the decision that the ALJ even considered this impairment, let alone is there sufficient explanation in the decision for the Court to understand any such reasoning on the part of the ALJ." (*Id.*).

Defendant does not dispute the ALJ failed to address Plaintiff's dysfunctional uterine bleeding, but rather contends that because "the medical record contains very little evidence about Plaintiff's uterine bleeding, . . . it is hardly surprising that the ALJ did not

15

discuss this symptom in the decision." (Doc. #11, *PageID#* 617). Defendant argues that "[u]nder the circumstances, the ALJ did not commit reversible error by not discussing Plaintiff's symptoms of uterine bleeding." (*Id.* at *PageID#* 618). While the medical evidence relating to Plaintiff's uterine bleeding is certainly not extensive, Plaintiff's counsel at the hearing did specifically elicit testimony from Plaintiff regarding this condition. In fact, Plaintiff testified, in great detail, that approximately every three months she has her menstrual cycle, which lasts for 10 days, and causes her significant pain to the point that she stays in bed and does not go out during that time. (Doc. #7, *PageID#* 103-04). Plaintiff also testified that her doctors have told her they cannot help her because she is already older than 40. (*Id.*). Plaintiff further stated that she experiences significant vaginal bleeding that is difficult to control during those days, and that this has been happening for many years. (*Id.*). Plaintiff's counsel again addressed this issue during his closing argument. He specifically stated, "[e]ven if we . . . were to set aside the cardiac related symptoms we still have the issue with the menstrual cycle which is going to cause absenteeism, or at the very least time off task during that time of the month that would preclude her from maintaining employment long term." (*PageID#* 133).

As it relates to Plaintiff's diabetes, Defendant is correct in noting that the ALJ's failure to categorize this impairment as "severe," instead of "nonsevere," is not legally relevant. (Doc. #11, *PageID#* 614). However, while the mere failure of an ALJ to consider a claimant's medically determinable impairment as "severe," instead of

16

"nonsevere," may be found to be "legally irrelevant," *see Simpson v. Comm'r of Soc. Sec.*, 344 Fed. Appx. 181, 190-91 (6th Cir. 2009), the same is not also true regarding an ALJ's total failure to consider an impairment. As it relates to Plaintiff's dysfunctional uterine bleeding, the ALJ did not simply miscategorize the impairment as "nonsevere," instead of "severe," rather, she failed to provide any indication whatsoever that she actually considered this impairment at any step in the sequential analysis. *Simpson* explains the regulatory basis for this error:

> Pursuant to 20 C.F.R. §[] 404.1523...: "In determining whether your physical or mental impairment or impairments are of a sufficient medical severity ... we will consider the combined effect of all your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process."
>
> Pursuant to 20 C.F.R. §[] 404.1545(a)(2)...: "If you have more than one impairment. We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity."

*See Simpson,* 344 Fed. Appx. at 191, n.1.  Perhaps the ALJ may have reached the same conclusion even after considering Plaintiff's dysfunctional uterine bleeding, however, there is nothing to indicate such an impairment was ever considered, and the Court will not speculate otherwise.  Defendant is correct in noting that an ALJ need not discuss every piece of evidence submitted, but an ALJ is required to consider all of a claimant's medically determinable impairments.  *See* 20 C.F.R. § 404.1545(a)(2).  Considering the attention given to Plaintiff's dysfunctional uterine bleeding during the hearing, as well as

17

the presence of medical evidence supporting such a diagnosis, the ALJ should certainly have been aware of, and therefore considered, this impairment during her sequential analysis. Failure to do so constitutes reversible error.[4]

## VI. REMAND IS WARRANTED

If an ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case, because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. For example, many of the symptoms Plaintiff complains of appear to be at least partially attributable to her noncompliance with medication, she was cleared to return to work (from a cardiac standpoint) in June 2009, and many of Plaintiff's activities, as noted by the ALJ, tend not

---

[4] In light of the above review, and the resulting need for remand of this case, an in-depth analysis of Plaintiff's remaining contentions is unwarranted.

to support finding she is under a "disability" within the meaning of the Social Security Act. (*See PageID##* 80, 383). Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of § 405(g), due to the errors outlined above. On remand the ALJ should be directed to evaluate Plaintiff's disability claim under the required five-Step sequential analysis to determine anew whether Plaintiff was under a disability and whether her application for SSI and DIB should be granted. Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made regarding whether Plaintiff Lasonya Spidell is under a "disability" within the meaning of the Social Security Act;

3. This matter be **REMANDED** to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and,

4. The case be terminated on the docket of this Court.


December 18, 2012

                                                  s/Sharon L. Ovington
                                                    Sharon L. Ovington
                                            United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(c), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).